**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF KIAN SAADAT YAZDI<br><br>Applicant. | Case No: ______________<br><br>**DECLARATION OF CARLO FEDRIGOLI** |

I, **CARLO FEDRIGOLI**, declare under penalty of perjury under the laws of the United States:

## INTRODUCTION

1. I am the founder of the Onoma FZE, a law firm with its principal place of business located at Hamad Bin Mohammed Street, P.O. Box 4422, Fujairah, the United Arab Emirates ("UAE"). I represent Kian Saadat Yazdi ("Applicant") in civil proceedings pending in the Dubai International Financial Centre ("DIFC") Courts of the UAE.

2. I respectfully submit this Declaration in support of Applicant's petition pursuant to 28 U.S.C. § 1782 for an order directing the respondents to provide discovery in the form of documents and deposition testimony for use in the proceeding pending before the DIFC Courts, in which the Applicant is seeking a declaratory judgment to invalidate a purported personal guarantee tied to a commercial loan both of which are alleged to have been the product of fraud.

3. I make this Declaration based upon my personal knowledge of the facts and those facts obtained from my review of documents and information provided to me in connection with my legal representation of Applicant in the DIFC Courts proceeding.

4. Applicant and his father Hassan Saadat Yazdi ("Hassan Yazdi") are significant passive investors and shareholders in a technology company headquartered in the UAE named Pacific Control System LLC ("PCS" or the "Company").

5. In 2016, PCS's senior management abruptly resigned right before the Company announced that it had approximately $326 million in undisclosed loan liabilities, which it could not repay. PCS collapsed and Applicant and Hassan Yazdi sustained a total loss on their investments. Within a few months, Applicant and Hassan Yazdi were sued by the PCS lenders on purported personal guarantees tied to the undisclosed loans the lenders issued to PCS.

6. Applicant and Hassan Yazdi have denied signing the personal guarantees or even having knowledge of their existence. Applicant and Hassan Yazdi have retained law firms in multiple jurisdictions to defend against these enforcement actions. In addition to investigating the forged personal guarantees, Applicant also engaged advisors to investigate the circumstances surrounding the abrupt collapse of PCS and the dissipation of the loan proceeds that the Company's senior management procured.

7. I was retained by Applicant to commence a legal action in the DIFC Courts to invalidate one of the forged personal guarantees tied to a commercial loan issued by United Arab Bank ("UAB") to PCS in the amount of AED 125,000,000 ($33,750,000), which remained outstanding. Applicant filed a declaratory judgment in the DIFC Courts (Court of First Instance), Claim Number CFI 031-2017 (the "DIFC Proceeding") seeking an order invalidating the purported personal guarantee on the basis that the personal guarantee was forged.

8. In the course of the DIFC Proceeding, Applicant hired advisors to investigate the circumstances surrounding PCS's collapse and its senior management's decisions to procure numerous large loans relative to the Company financial wherewithal to repay them.

9. Applicant's preliminary investigation revealed that PCS's Chief Executive Officer Dilip Rahulan ("Rahulan") and PCS's former Chief Financial Officer Srinivasan Narasimhan ("Narasimhan") artificially inflated the financials of PCS using a variety of accounting gimmicks and fraudulent roundtripping transactions between 2012 – 2016. The fraud consisted of fictitious invoices from shell companies being generated by Rahulan and Narasimhan and disguised as legitimate commercial transactions between PCS and the shell companies, which purported to be suppliers or customers of PCS. These fake transactions provided PCS with the appearance of healthy revenue and inflated the Company's financials, which were then used by Rahulan and Narasimhan to procure loans from several lenders, including UAB. The proceeds of said loans are largely unaccounted for and believed to have been misappropriated by Rahulan, Narasimhan, and their co-conspirators.

10. Applicant, through his advisors, discovered that Rahulan, Narasimhan and their staff deleted company financial information, misappropriated PCS computer disks containing company financial information and forged PCS company documents. *See* **Exhibit 1** for a true and correct copy of a news story appearing in the Khaleej Times, titled "Pacific Controls plans to unravel 'mystery of missing DH370m,'" which describes the dire condition of PCS immediately after Rahulan and Narasimhan resigned from the company and Narasimhan's efforts at destroying evidence.

11. The discovery sought from the United States in the proposed Section 1782 Order and accompanying subpoenas is aimed at obtaining bank records of the fraudulent roundtripping payments effectuated by using fictitious invoices either to or from PCS and two of its affiliates Pacific Controls Cloud Services FZE ("PCCS") and Pacific Controls Inc. ("PCI") and the shell entities. In addition, the subpoenas seek bank records evidencing payments to or from Rahulan

and Narasimhan, which would reveal kickback payments from the stolen proceeds to their co-conspirators controlling the shell entities who participated in the roundtripping fraud.

12. The discovery from the United States will be used in the pending DIFC Proceeding to provide evidence of the underlying PCS fraud pursuant to which numerous personal guarantees in the name of Applicant were fraudulently issued (by Rahulan and Narasimhan), including the one issued to secure the UAB loan. Moreover, this discovery will not only assist Applicant in the pending DIFC Proceeding but also provide relevant information for Applicant to amend his pleadings so that he can file third-party claims against PCS, PCCS, PCI, Rahulan and Narasimhan for the damages incurred by Applicant as a result of the fraudulent personal guarantee.

**SUMMARY OF THE DIFC PROCEEDING**

13. Applicant was first notified that UAB filed an action against him and Hassan Yazdi on February 28, 2017 when they were served with UAB's complaint, which sought to enforce the purported personal guarantees tied to a credit facility issued by UAB to PCS in Dubai in the amount of AED 125,000,000.00 ($33,750,000). UAB's action was filed in Kuwait ("Kuwait Proceeding").

14. I was retained shortly after Applicant was served with the complaint from the Kuwait Proceeding and instructed to commence the DIFC Proceeding to invalidate the purported personal guarantee on the basis of fraud and forgery.

15. The DIFC Courts have jurisdiction over disputes arising from the UAB credit facility and personal guarantee because the purported UAB credit facility agreement provides that "*The courts of the Relevant Emirate or the courts of the Dubai International Financial Centre ("DIFC") have non-exclusive jurisdiction to settle any dispute arising out of or in connection with any Transaction Document.*"

16. The DIFC Courts forum is modeled on English substantive and procedural laws and thus provided the Applicant with the right to take disclosure (i.e., discovery) and to join future third-parties as necessary parties or third-party defendants at a later stage in the litigation if the facts warranted the joinder of additional parties.

17. On June 22, 2017, my firm initiated an action against UAB seeking a declaratory judgment from the DIFC Courts that Applicant's purported personal guarantee was not signed by him and is therefore void *ab initio* as a binding instrument.

18. In the complaint, I reserved the Applicant's rights to claim compensation and/or damages from UAB, including for losses arising as result of the negligence, deceit and fraudulent conduct in connection with the fraudulent roundtripping transactions effected from the UAB facility and the artificial inflation of PCS' financials.

19. A true and correct copy of Applicant's complaint filed in the DIFC Proceeding is attached herein as **Exhibit 2**.

20. The Applicant's complaint in the DIFC Proceeding was accompanied by an expert report prepared by renowned forensic handwriting expert Dr. Ahmed Obaid Al Bah who concluded that the signatures on Applicant's personal guarantee were not his own but had been the product of forgery. A true and correct copy of Dr. Al Bah's forensic expert report is attached herein as **Exhibit 3**.

21. Recognizing the different procedural postures and claims for relief, the DIFC Courts permitted Applicant to go forward with his declaratory judgment action even though Applicant is a defendant in the personal guarantee enforcement action commenced by UAB in Kuwait.

22. The Kuwait Proceeding is currently on appeal before the last appellate tribunal. On November 19, 2017 and January 7, 2018, the Kuwaiti Court of First Instance held that Applicant's personal guarantee was forged and referred the court file (including the original personal guarantees) to the Kuwaiti public prosecutor's office for a criminal investigation. A true and correct copy of the decisions from the Kuwait Court of First Instance are attached herein as **Exhibit 4.** The decisions were based on, among other things, a report from the court appointed experts from the Kuwaiti General Department of Criminal Evidence (an agency within the Kuwaiti Ministry of the Interior) that concluded that the personal guarantees of both the Applicant and Hassan Yazdi were forged. A true and correct copy of the Kuwaiti General Department of Criminal Evidence's forensic expert report is attached herein as **Exhibit 5.**

23. UAB appealed the Court of First Instance's decision to the Kuwaiti Court of Appeal and petitioned the Court of Appeal to refer the original personal guarantees to a new panel of experts for a forensic examination as to the authenticity of the signatures.

24. In the hearing dated October 27, 2021, the Court of Appeal rejected the UAB appeal substantively. The decision was based on, among other things, a new report from a panel of court appointed experts that concluded that the personal guarantees of both the Applicant and Hassan Yazdi were forged. True and correct copies of the decision of the Court of Appeal and the report relied upon by the Court of Appeal are attached herein as **Exhibit 6**.

25. UAB appealed the Court of Appeal's decision on December 20, 2021, in appeal no. 4356 to the Kuwaiti Court of Cassation.

26. The Court of Cassation has not yet issued its decision on UAB's appeal.

27. The DIFC Proceedings were progressing in tandem with the Kuwaiti Proceedings. To date, UAB has been unable to produce any evidence corroborating that the Applicant signed the personal guarantee.

28. On January 14, 2018, the DIFC Courts entered an order directing the production by UAB to the DIFC Courts of the 'originals' of the personal guarantee purportedly signed by Applicant.

29. UAB was unable to produce the Applicant's purported original personal guarantee because the document is in the temporary possession of the Kuwaiti Courts. As a result, on October 11, 2018, the DIFC Courts temporarily stayed the DIFC Proceeding until such time when the DIFC Courts receive the original personal guarantee from the Kuwaiti Court of Cassation so that it can be inspected by the experts appointed by the parties in the DIFC Proceeding. The DIFC Courts has formally requested said document from the Kuwaiti Court of Cassation. A true and correct copy of the DIFC Courts' October 11, 2018 decision is attached as **Exhibit 7**.

30. As of the date of this Declaration, the DIFC Proceeding is still stayed. However, the Kuwaiti Court of Cassation has heard oral argument and the case file is closed and the parties await the Kuwaiti Court of Cassation's final and non-appealable judgment in due course. Once the Kuwaiti Court of Cassation decision is issued, the DIFC Courts will lift the stay and the DIFC Proceeding will resume.

31. As explained above, under the applicable DIFC law, Applicant is still able to amend his complaint to add new claims for damages either against UAB or other third-parties (e.g., PCS, Rahulan or his co-conspirators) for the fraud relating to the UAB credit facility and purported personal guarantee issued in the Applicant's name.

32. Once the stay is lifted by the DIFC Courts, I have been instructed to amend Applicant's complaint to add claims for fraud, deceit and forgery against PCS, PCCS, PCI, Rahulan and Narasimhan. The documents and deposition testimony from the United States will assist Applicant in proving his case in the DIFC Proceeding against these new defendants as well as identifying their co-conspirators who may also be joined as defendants prior to the deadline for amending pleadings.

**THE DIFC COURTS AND DIFC LAWS**

33. UAE Federal Law No. 8/2004 permitted the establishment of financial free zones in the UAE. This law provided that free zones would be exempt from the federal civil and commercial laws applicable to the UAE (i.e., the local UAE laws).

34. The DIFC free zone was established by the Federal Decree No. 35/2004 to, among other things, promote Dubai as a global financial centre and develop the local economy. One of the main bodies of the DIFC is the Dispute Resolution Authority, which supervises the legal system in the DIFC free zone.

35. Unlike the local UAE onshore courts, which adhere to a civil law legal system, the DIFC Courts apply common law within the DIFC "offshore" free zone. The DIFC Courts have developed their own body of precedent anchored in the common law but also apply the substantive law of England and Wales. In addition, the procedural law of the DIFC Courts closely mirrors that of the English court system and the judges selected to sit in the DIFC Courts are drawn from England, Scotland, Malaysia, Australia and the UAE.

36. The DIFC Courts will accept evidence obtained by a party outside of the DIFC jurisdiction. Indeed, there is no prohibition on a party availing itself of foreign proof gathering mechanisms in a foreign jurisdiction such as the United States to assist in the maintenance of its

claim or defense in an action pending in the DIFC Courts. Also, in accordance with Section 30.65 of the Rules of the DIFC Courts 2014, the DIFC Courts have authority to provide litigants with assistance to obtain evidence for proceedings pending in other courts and tribunals within and outside of the UAE. Therefore, the DIFC Courts are familiar with cross-border disputes and are familiar with litigants' needs to engage in cross-border evidence gathering to support a party's claims or defenses. Attached hereto as **Exhibit 8** is a true and correct copy of Part 30 of the Rules of the DIFC Courts, accessible from www.difccourts.ae/rules-decisions/rules/part-30.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 9, 2022

CARLO FEDRIGOLI